**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Louise Taylor and Phillip Taylor | Case No. |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| New York Life Insurance Company and New York Life Insurance and Annuity Corporation | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Louise Taylor and Phillip Taylor, by and through their undersigned attorneys, for their Complaint against defendants New York Life Insurance Company and New York Life Insurance and Annuity Corporation hereby allege as follows:

### NATURE OF THE CASE

1.   This is an action for breach of contract, tortious interference with contract, and breach of fiduciary duty arising out of the Defendants' failure to respect the spirit and the letter of a spendthrift structured settlement agreement ("**Settlement Agreement**") entered into in connection with the settlement of a gruesome personal injury case in December of 1989.[1]

### THE PARTIES

2.   Plaintiffs Louise Taylor and her husband Phillip Taylor (the "**Taylors**") or ("**Plaintiffs**") are citizens of the Commonwealth of Virginia. Both Louise Taylor and Phillip Taylor are parties to the Settlement Agreement described herein.

---

[1] *See*, Richardson, L. (1989). Va. Family Shares Child's Enduring Pain. *The Washington Post*. Copy attached hereto as **Exhibit A**.

3. Defendant New York Life Insurance Company is a New York domiciled insurance company with its principal place of business at 51 Madison Avenue, New York, NY 10010 ("**NY Life**").

4. Defendant New York Life Insurance and Annuity Corporation is a Delaware corporation with its principal place of business at 51 Madison Avenue, New York, NY 10010 ("**NY Annuity**"). NY Annuity is a wholly owned subsidiary of NY Life.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action based on diversity of citizenship, pursuant to 28 U.S. C. § 1332 (a)(1). Plaintiffs are citizens of the Commonwealth of Virginia. Defendants are citizens of the State of New York because their principal places of business are in New York. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. Pursuant to 28 U.S.C. § 1391 (a), venue is proper in this District as both Defendants have principal places of business in this District and conduct business in this Judicial District. Venue is also proper in this District because Defendants' tortious acts occurred in this District, Defendants accepted payments in this District, and Defendants made payments to third parties from this District related to this matter.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

7. This is an action for damages incurred by Louise and Phillip Taylor as a proximate result of NY Life and NY Annuity's failures as described herein. This action also seeks punitive damages against NY Life for its repeated, ongoing, and blatant breach of the fiduciary duties they owe to Plaintiffs to protect specifically identified periodic payments from dissipation as contemplated by the Settlement Agreement. Plaintiffs assert that NY Life is

breaching its ongoing duty to protect the settlement *res* to further its own economic interests at the Taylor family's expense.

8.     Over the course of just twenty-four (24) months, NY Life and NY Annuity disregarded their duties to effectuate the Settlement Agreement and allowed a lifetime of structured settlement periodic payments intended for Louise and Phillip Taylor's son, Terrence Taylor, to be devoured by vultures in the factoring industry.[2]  Notwithstanding specific provisions in the Settlement Agreement to prevent the dissipation of the periodic payment obligations owed to Terrence Taylor, NY Life and NY Annuity improperly consented to ten (10) transactions divesting Terrence Taylor of more than $11,000,000 in periodic payments in direct contravention of the Settlement Agreement and Dismissal Order in the DeLonghi Litigation[3] and in violation of applicable laws.  These were the same periodic payments NY Life and NY Annuity promised to deliver to Terrence Taylor – and only Terrence Taylor. The last scheduled monthly periodic payment contemplated under the Settlement Agreement that should have been made to Terrence Taylor, and only Terrence Taylor, was in the amount of $14,439.72 and was due on July 2, 2019.

9.     With their injured son's carefully crafted spendthrift structured settlement destroyed, Louise and Phillip Taylor have resumed full-time financial responsibility and lifecare for Terrence Taylor something they were assured long ago would never happen.

***Structured Settlements and the Factoring Industry***

10.    A structured settlement is a commonly used tool for settling tort claims.  Over thirty years ago, with bipartisan support, Congress adopted laws to encourage the use of structured

---

[2] *See*, McCoy, Terrence. (2015) Perils of early payoffs in Virginia. *The Washington Post*. Copy attached hereto as **Exhibit B**.

[3] *See infra*, paragraph 21.

settlements. *See* Periodic Payment Settlement Tax Act of 1982, Pub. L. No. 97-473, H.R. 5470, 97th Cong. (1983). Structured settlements have the benefit of providing long-term periodic payments to injury victims in need of regular income to pay for their day-to-day needs and future medical care. Pursuant to 26 U.S.C. § 104 (a) (2) damages paid "on account of" a physical injury or wrongful death are tax-free to the injury victim.

11.    Further preferential tax treatment is provided to settling defendants (and their insurers) who utilize a structured settlement. Pursuant to 26 U.S.C. § 130 settling defendants (and their insurers) may assign their liability to make periodic payments to the injury victim to a third-party via a "qualified assignment." This third-party, known in the industry as an "assignment company," then purchases an annuity contract from a financially secure insurance company to "fund" the periodic payment obligations to the settling plaintiffs in accordance with the specific terms of the Settlement Agreement.

12.    The third-party assignment company is often a company that is wholly owned by the insurance company issuing the annuity contract (as is the case here). To preserve the preferential tax treatment provided under 26 U.S.C. §§ 104, 130, the third-party assignment company is named as the "owner" or "policy holder" under the annuity policy and the injury victim is the "annuitant."

13.    Congress prescribed detailed rules governing the assignment process in 26 U.S.C. § 130(c)(d) meant to ensure that the periodic payment obligations assumed by the assignment company (here, NY Annuity) are identical to the obligations of the settling defendants (the DeLonghi defendants) and are identical to the payments to be made pursuant to the annuity policy (issued here by NY Life).

14. By the mid to late 1990s, a "secondary market" or "factoring industry" had developed in which specialty finance companies acquired periodic payment rights from structured settlement recipients like Terrence Taylor in exchange for lump sum payments. Unscrupulous factoring companies often took advantage of injury victims by purchasing their periodic payments at deep discounts using predatory sales tactics. This early factoring industry was entirely unregulated.

15. In response to the predatory tactics of the factoring industry, states began to enact what are known as Structured Settlement Protection Acts ("**SSPAs**") to protect injury victims from the high-pressure sales practices, unconscionable discount rates, and aggressive collection practices of certain factoring companies.

16. To date, forty-nine states, including New York, Virginia, and West Virginia, have enacted SSPAs. While the state statutes are not identical, most are based on model legislation promulgated by the National Structured Settlement Trade Association and the National Association of Settlement Purchasers. *See* Daniel W. Hindert & Craig H. Ulman, *Transfers of Structured Settlement Payment Rights What Judges Should Know About Structured Settlement* Protection *Acts*, 44 Judges' J. pp. 19, 20-21 (Spring 2005) ("**Hindert & Ulman Article**").

17. The state SSPAs require that all transfers of structured settlement periodic payments be authorized, in advance, by court order. *See* Hinder & Ulman Article p 20, fn. 4.

18. Each state's SSPA also requires that the factoring company provide notice of any transfer of structured settlement periodic payments to the "interested parties" who include the annuity issuer (here, NY Life) and the annuity obligor (here, NY Annuity), informing them of their opportunity to "oppose, support, or otherwise respond" to the proposed transfer.

*See* Hindert & Ulman Article, p 22, 27. This requirement is included in the SSPAs "to insure that due process is afforded to those who may be interested in a proposed transfer." *Id*. at p 27.

19. To add a penalty for factoring companies that fail to obtain a "Qualified Order" before purchasing structured settlement periodic payments, Congress enacted 26 U.S.C. § 5891 in 2002, which provides that anyone who "directly or indirectly" acquires any structured settlement periodic payments in a structured settlement factoring transaction without a Qualified Order is subject to a 40% excise tax. The purpose of the excise tax is to impose a punitive tax "on transfers of structured settlement payment rights, except in cases in which courts find that 'the extraordinary and unanticipated needs of the original intended recipient' make these transfers desirable." *See* Hindert & Ulman Article pp. 20-23, fn. 14.

### *Terrence Taylor's Structured Settlement*

20. In April 1988, Terrence Taylor's mother, Louise Taylor activated a defective space heater in her master bedroom resulting in a horrific fire in the Taylor home that changed the Taylor's lives forever. As a result of this fire, Terrence Taylor suffered severe and permanent injuries, including, but not limited to third-degree burns over 60% of his body. Terrence Taylor lost the fingers on his right hand, the toes on his left foot, and his right leg. Terrence Taylor remains visibly scarred on his face, torso, and limbs and he wears a prosthetic leg. Terrence Taylor's cognitive abilities are considerably below that of other people, and he lacks the ability to separate reality from fantasy.

21. In 1989, Louise Taylor, Phillip Taylor, and Terrence Taylor, a minor, by and through his mother and next friend, Louise W. Taylor sued the manufacturer of the space heater in an action styled *Taylor E. Taylor, a minor, by and through his mother and next friend, Louise*

*W. Taylor, et. al., Plaintiffs v. DeLonghi, S.P.A., et al., Defendants* (Civil Action No. 89-0971-A) (D. Va., Alexandria Division) (the "**DeLonghi Litigation**").

22.    In December 1989, the Taylor's settled the DeLonghi Litigation using, *inter-alia*, a "structured settlement" which provided for a lifetime of periodic payments to Terrence Taylor to be paid on an annual and monthly basis, increasing annually, until his death. Louise Taylor and Phillip Taylor were both parties to the Settlement Agreement.

23.    A condition precedent to the settlement of the DeLonghi Litigation was that the settling defendants use a NY Life annuity policy to fund Terrence Taylor's periodic payments. This condition was important to Louise and Phillip Taylor, their counsel, and the court.  NY Life was (and is) a top-rated insurance company with a stellar reputation. NY Life has been in existence for more than 100 years.  Louise Taylor took great solace in knowing that NY Life would be the steward of her son's periodic payments, making sure he would receive them long after she departed this world.

24.    The Settlement Agreement was carefully drafted to provide a secure, tax free income stream sufficient to provide for all of Terrence Taylor's financial and medical needs for his lifetime. This Settlement Agreement was incorporated by reference into the Dismissal Order issued by Judge Albert V. Bryan in the DeLonghi Litigation. The Taylor's Settlement Agreement contained a very strict anti-assignment ("spend-thrift") clause that prohibited Terrence Taylor, ***or any other payee*** from having the ***power*** to transfer or assign the Periodic Payments.

> the Periodic Payments cannot be accelerated, deferred, increased or decreased by the <u>Plaintiff or any payee; nor shall the Plaintiff or any Payee have the ***power*** to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment or otherwise.</u> (emphasis added).

25.    This spendthrift anti-assignment clause denying any payee the "power to sell . . . the Periodic Payments" was freely negotiated by the parties to the settlement. This provision was included in the Settlement Agreement specifically to protect Plaintiffs. [4]

26.    Louise Taylor recalls being told that "nobody could touch the payments intended for her baby" and that "we are going with NY Life because they are an A plus company with the best reputation for protecting serious injury victims like Terrence." Louise Taylor also recalls that she agreed to settle the DeLonghi matter, rather than proceed to trial, based on assurances that she could go to her grave knowing that her child would never be homeless and would never go hungry.

27.    Each party to the DeLonghi Litigation was so concerned about protecting Terrence Taylor that in December 1989 (prior to entering into the Settlement Agreement) they met with Judge Albert V. Bryan to provide assurances to him that the settlement would be structured "in such a way that no-one could destroy ... its guaranteed periodic payments." *See* Affidavit of Robert F. Muse, Esq., a copy of which is attached hereto as **Exhibit C**. [5]

---

[4] Contractually negotiated anti-assignment provisions in general, and more specifically, in regard to the assignment of structured settlement payments, have traditionally been upheld by Virginia courts. *Symetra Life Ins. Co. v. Fentress*, Civil Action No. 3:05-cv-289, 2006 U.S. Dist. LEXIS 101593 (E.D. Va. Feb. 6, 2006); *Allstate Ins. Co. v. American Bankers Ins. Co. of Florida*, 882 F.2d 856 (4th Cir. 1989); *Liberty Life Assurance Co. v. Gilbert,* No. 2:02-CV-341, 2006 U.S. Dist. LEXIS 26937 [*18] (E.D. Tenn. May 3, 2006). As per specific contractual provisions in each agreement, the Settlement Agreement and the Qualified Assignment are governed by Virginia law.

[5] Mr. Muse was primary trial counsel for Louise and Phillip Taylor in the DeLonghi Litigation. The Settlement Agreement attached to Mr. Muse's Affidavit was originally filed under seal. The Settlement Agreement was unsealed by Court Order dated May 22, 2015. *See* DeLonghi Litigation, Dkt. 2.

28. The settling defendants agreed to fund the periodic payments to Terrence Taylor "through the purchase of an annuity policy from New York Life Insurance Company." No other insurance company was authorized to issue the annuity policy – just NY Life.

29. The Settlement Agreement provided that the settling defendants could "make a 'qualified assignment' within the meaning of Section 130(c) of the Internal Revenue Code of 1986… to New York Life Insurance and Annuity Corporation." No other assignment company was authorized to assume the DeLonghi defendants' periodic payment obligations that arose under the Settlement Agreement – just NY Annuity.

30. On December 18, 1989, the settling defendants in the DeLonghi Litigation funded the purchase of an annuity contract from NY Life by paying an amount equal to the single premium due under the specified single-premium annuity to NY Annuity.

31. As contemplated by the Settlement Agreement, NY Annuity immediately purchased an annuity contract from its affiliate, NY Life, to cover the future periodic payment obligations it assumed from the DeLonghi Litigation defendants, with funds paid to it by the DeLonghi defendants.

32. The very next day, on December 19, 1989, the DeLonghi Litigation defendants' obligations under the Settlement Agreement were released and all of the periodic payment obligations thereunder were assigned to NY Annuity via a qualified assignment under Section 130 of the Internal Revenue Code (the "**Qualified Assignment**").

33. The Qualified Assignment had the effect of transferring ***all*** of the payment obligations under the Settlement Agreement from the settling DeLonghi defendants to NY Annuity.

34.  This "transfer of obligations" constituted a novation[6] of the Settlement Agreement and NY Annuity assumed the responsibility of making the periodic payments in accordance with the specific spend-thrift terms of the Settlement Agreement.

35.  The Qualified Assignment provided that "<u>all rights of ownership and control of such annuity contract shall be and remain vested in [NY Annuity] exclusively</u>." (emphasis added).

36.  The Qualified Assignment further provided that "<u>None of the Periodic Payments may be accelerated, deferred, increased or decreased and may not be anticipated, sold, assigned or encumbered.</u>" (emphasis added).

37.  The Annuity Policy issued by NY Life also contains a clause that prohibits assignment: "<u>a beneficiary does not have the right to advance, assign, or change any payment, or elect to receive the payments in one sum.</u>" (emphasis added).

38.  Despite all of this, NY Annuity and NY Life did not live up to their obligations to Louise and Phillip Taylor to make the periodic payments to Terrence Taylor as contemplated by the Settlement Agreement.

39.  NY Life was carefully chosen by the parties to the DeLonghi Litigation to be the steward over the Taylor Structured Settlement. NY Life was even specifically written into the Settlement Agreement (which was approved by Judge Bryan) to accomplish this task. NY Life failed miserably.

***Terrence Taylor Falls Prey to Vultures in the Factoring Industry***

40.  Beginning in 2012, Terrence Taylor fell prey to the high-pressure sales tactics of several factoring companies including Structured Asset Funding, LLC d/b/a 123 Lump Sum;

---

[6] "A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." Restat 2d of Contracts, § 280 (2nd 1981).

Blazingstar Funding, LLC; Jay Gee, LLC; iSettlements LLC d/b/a 123 Lumpsum; and HPF Capital d/b/a Highpoint Funding.

41.    Over the course of just twenty-four (24) months, Terrence Taylor sold every one of his guaranteed structured settlement periodic payments, and his life-contingent payments going out to 2042, in ten (10) inconceivable factoring transactions thereby denying Plaintiffs the benefit of their bargain when they agreed to the specific terms of the Settlement Agreement.

42.    Nine of the ten transfer petitions (the "**Petitions**") were filed in Portsmouth Circuit Court in the Commonwealth of Virginia, a district known to the factoring companies (and insurance companies like NY Life) to be a court that would "rubber stamp" transfer petitions unless opposed by insurers like NY Life.

43.    On April 9, 2014, the date on which of one of the Taylor Petitions was presented, there were nineteen (19) transfer petitions on the court's calendar at 9:00 a.m., all of which were scheduled to be heard before the next case on the court's calendar at 9:30 a.m. *See* Portsmouth Circuit Court Docket for April 9, 2014, a copy of which is attached hereto as **Exhibit D**.

44.    NY Life and NY Annuity received notice of each of the Petitions.

45.    NY Life and/or NY Annuity received fees from factoring companies in exchange for their consent to each and every factoring transaction involving Terrence Taylor.

46.    NY Life and NY Annuity knew that the Settlement Agreement contained strict anti-assignment or spend-thrift language that denied Terrence Taylor (or any other payee) the *power* to sell the periodic payments under any circumstances whatsoever.

47.     NY Life and NY Annuity knew that **_all_** of the factoring transactions violated the Settlement

Agreement and Dismissal Order in the DeLonghi Litigation.

48.     NY Life and NY Annuity could have simply refused to consent to the Petitions based on

the Settlement agreement or "opposed" each of these Petitions pursuant to Section 59.1-

477 of the Virginia SSPA and stopped the transfers. They did not do so, despite the

numerous "red flags" alerting them to irregularities in these Petitions which included:

(i)     that each Petition violated the dismissal order in the DeLonghi Litigation;

(ii)    that each Petition expressly violated the anti-assignment ("spend-thrift")

provisions of the Settlement Agreement;

(iii)   the sheer number of Petitions filed in a short period of time;

(iv)    the West Virginia notary stamps on legal documents that were filed in the

Commonwealth of Virginia;

(v)     the improbable "reasons" listed in the Petitions which included "creating a

non-profit organization;" and

(vi)    the apparent systematic waiver by Terrence Taylor of independent

professional advice in connection with the Petitions.

49.     NY Life and NY Annity could have alerted Plaintiffs, and/or their counsel, whose names

are all located in the Settlement Agreement and Dismissal Order in the DeLonghi Litigation

prior to consenting to each and every transfer.  They chose not to do so.

### _NY Life Uses Its Status and Power to Strong-Arm Terrence Taylor_

50.     In a bold move, instead of protecting the interests of Plaintiffs and Terrence Taylor, <u>and

after consenting to eight (8) transfers without any contact with Plaintiffs or Terrence Taylor

at all</u>, NY Life required a "Stipulation" in connection with the Petition filed in Portsmouth

Circuit Court under Case No. 14-972 on March 18, 2014 by iSettlements LLC, <u>in which one of the provisions of the Stipulation purportedly required Terrence Taylor to waive the "anti-assignment" language of the Settlement Agreement</u>, despite the fact that NY Life knew that the Settlement Agreement itself denied him or any other payee the ***power*** to do so.

51.   The Stipulation NY Life attempted to use to insulate itself from liability is a nullity as a matter of law.

52.   In connection with the preparation and execution of this Stipulation, NY Life engaged the law firm of Drinker Biddle & Reath LLP. A partner from Drinker Biddle, Susan J. Stauss, then executed the Stipulation on behalf of NY Life. The Stipulation was also signed by Andrew Savysky, as the President of iSettlements, LLC. Mr. Savysky is also an attorney admitted to practice in the State of Florida as authorized house counsel, Bar Number 97018. This Stipulation was also signed by Anthony McGuinness on behalf of Income Stream Funding Partners LLC, the "investor" receiving the payments iSettlements LLC purportedly purchased from Terrence Taylor. Mr. McGuinness is listed with the Secretary of State of Massachusetts as a Manager of Income Stream Funding Partners LLC. Upon information and belief, Mr. McGuinness is also an attorney, admitted to practice in the Commonwealth of Massachusetts. Finally, this Stipulation was also purportedly signed by Terrence Taylor in front of a West Virginia notary by the name of Patricia A. Foster.[7] Terrence Taylor was not represented by counsel. He isn't an attorney. He is the permanently injured son of Plaintiffs, the recipient of specifically identifiable periodic

---

[7]   Terrence Taylor has no recollection of signing this Stipulation and believes that the signature on this Stipulation purporting to be his may be a forgery.

payments under a Settlement Agreement that named NY Life (and only NY Life) as the entity charged with protecting those specifically identifiable payments from dissipation.[8]

53.     NY Life had every opportunity to protect Mr. and Mrs. Taylor from having to take over financial responsibility for Terrence Taylor by simply respecting the terms of the Settlement Agreement, but they chose not to do so.

54.     NY Life was even alerted to the improper factoring transactions by Louise Taylor before the last remaining pennies of her son's periodic payments were sold off, but NY Life refused to do anything to stop the serial sales. Instead, NY Life told Louise Taylor that since Terrence Taylor was no longer a minor, there was nothing that she could do to prevent dissipation. This is not what was contemplated by the Settlement Agreement, the Dismissal Order, the Virginia SSPA, 26 U.S.C. §§ 104, 130, or Section 5891 of the Internal Revenue Code.

55.     In total, under the watch of NY Life, factoring companies managed to bilk Terrence Taylor out of $11,000,000 in periodic structured settlement payments.

56.     The motivation of NY Life and NY Annuity for failing to live up to their obligations under the Settlement Agreement and Qualified Assignment is unclear, but public information points to financial motivation.

57.      In addition to the "administrative fees" charged in connection with petitions to transfer structured settlement periodic payments, NY Life's 2017 Investment Report shows that 8%

---

[8]  NY Life also required Terrence Taylor to enter into an identical "Stipulation" in connection with the Petition filed in Fairfax Circuit Court under Case No. CL2014-07472. This Petition, filed on or about June, 2014 was the last Petition filed by a factoring company in connection with Terrence Taylor.

of its $180.6 Billion in assets are invested in asset-backed securities, including structured settlements.[9]

58.    Upon information and belief, NY Life even invested in structured settlement securitizations issued by the very same factoring company that filed six (6) of the Petitions, bilking Terrence Taylor out of $2,745,650.

59.    Upon further information and belief, NY Life's unholy alliance with that factoring company, and the factory industry in general, is designed, at least in part to protect their own investments in structured settlement backed term-securitization transactions.

### *Plaintiffs' Injuries*

60.    Plaintiffs Louise Taylor and Phillip Taylor have been injured as a result of the failure of NY Life and NY Annuity to live up to their express and implied contractual obligations under the Settlement Agreement, Qualified Assignment, and Annuity Policy.

61.    Plaintiffs Louise Taylor and Phillip Taylor were also injured as a consequence of NY Life's (i) tortious interference with the Settlement Agreement, and (ii) breach of its fiduciary duty to protect the periodic payments set forth in the Settlement Agreement from dissipation in order to further their own economic interests.

62.    Plaintiffs injuries are ongoing and continuous as Defendants continue to make periodic payments to entities other than Terrence Taylor, and Plaintiffs continue to support their injured son in all respects, despite their reasonable expectations after entering into the court approved Settlement Agreement that Terrence Taylor would never be homeless and never go hungry.

---

[9]  https://www.newyorklife.com/content/dam/nyl/docs/pdfs/financial-info/2017/NYL-Investment-Report.pdf (retrieved on May 20, 2019).

63. Notwithstanding Plaintiffs reasonable expectations, Terrence Taylor showed up on their doorstep hungry and homeless in June of 2014 after being forcibly evicted from his home in West Virginia.  Plaintiffs have been providing for their injured son ever since.

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**
*Against NY Annuity*

64. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

65. At all times relevant hereto, Terrence Taylor was the payee under the Settlement Agreement and the Annuity Policy.

66. Louise Taylor and Phillip Taylor were parties to the Settlement Agreement.

67. The anti-assignment ("spend-thrift") provisions of the Settlement Agreement are binding, valid, and enforceable restrictions under Virginia law.

68. The anti-assignment ("spend-thrift") provisions of the Settlement Agreement were included in that contract to protect Plaintiffs from financial ruin and emotional distress.

69. The precise "power" language included in the Settlement Agreement was specifically intended to protect the periodic payments from dissipation.

70. Pursuant to the Qualified Assignment, NY Annuity assumed the obligations of the DeLonghi defendants under the Settlement Agreement.

71. The Qualified Assignment is a novation of the Settlement Agreement.

72. As the owner and obligor under the Annuity Policy, NY Annuity was obligated to enforce the anti-assignment provision of the Settlement Agreement for the benefit of Plaintiffs.

73. NY Annuity knowingly breached the anti-assignment provisions of the Settlement Agreement.

74. Each time NY Annuity fails to direct NY Life to make payment to Terrence Taylor as provided in the Settlement Agreement and Qualified Assignment it breaches its contractual obligations to Plaintiffs.

75. As a direct and proximate cause of the aforesaid breach, to date Plaintiffs have suffered damages in the amount of $1,114,597.14. These damages increase by more than $14,000.00 per month as NY Annuity continues to breach its contractual obligations to Plaintiffs.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
*Against NY Life*

76. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

77. At all times relevant hereto, Terrence Taylor was the payee under the Settlement Agreement.

78. Louise Taylor and Phillip Taylor were parties to the Settlement Agreement.

79. The anti-assignment ("spend-thrift") provisions of the Settlement Agreement were included in that contract to protect Louise Taylor and Phillip Taylor.

80. In fact, one of the main reasons Louise Taylor and Phillip Taylor agreed to the Settlement Agreement was to ensure that they would not have to cover the future medical and lifecare expenses for their critically injured son, expenses they knew they did not have the financial wherewithal to address.

81. The anti-assignment provisions of the Settlement Agreement are binding, valid, and enforceable restrictions under Virginia law.

82. The Qualified Assignment constituted a novation of the Settlement Agreement.

83.   As issuer of the Annuity Policy, NY Life was obligated to make the payments thereunder to Terrence Taylor.

84.   While not a party to the Settlement Agreement and the Qualified Assignment, NY Life was the issuer of the Annuity Policy and had knowledge of the Settlement Agreement and the Qualified Assignment and knowingly breached the anti-assignment provisions of these Agreements.

85.   As a result, NY Life breached its implied contractual obligations to Plaintiffs. "A *quasi* or constructive contract rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In truth, it is not a contract or promise at all. It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex aequo et bono* belongs to another. Duty, and not a promise or agreement or intention of the person sought to be charged, defines it. It is fictitiously deemed contractual, in order to fit the cause of action to the contractual remedy." *Miller v Schloss*, 218 N.Y. 400, 113 N.E. 337 (1916); *Bradkin v. Leverton*, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970).  Under Virginia law, implied-in-law contracts, or "quasi contracts" establish liability "from an implication of law that arises from the facts and circumstances, independent of agreement or presumed intention. In such cases, the promise is implied from the consideration received, there the legal duty imposed upon the defendant defines the contract." *Hendrickson v. Meredith*, 161 Va. 193, 200, 170 S.E. 602, 605 (1933) (internal citations omitted).

86. As a direct and proximate cause of the aforesaid breach, to date Plaintiffs have suffered damages in the amount of $1,114,597.14. These damages increase by more than $14,000.00 per month as NY Annuity continues to breach its contractual obligations to Plaintiffs.

### THIRD CAUSE OF ACTION
### PROMISSORY ESTOPPEL
### AGAINST NY LIFE

87. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

88. At all times relevant hereto, Terrence Taylor was the payee under the Settlement Agreement.

89.  Louise Taylor and Phillip Taylor were parties to the Settlement Agreement.

90. The anti-assignment ("spend-thrift") provisions of the Settlement Agreement were included in that contract to protect Louise Taylor and Phillip Taylor.

91. NY Life was carefully chosen by the parties to the DeLonghi Litigation to be the steward over the Taylor Structured Settlement. NY Life was specifically written into the Settlement Agreement (which was approved by Judge Bryan) to accomplish this task.

92. NY Life had the right and the power under the Virginia SSPA to speak up and stop the transfers.  They also had a specific duty as described herein to make the periodic payments contemplated by the Settlement Agreement.  New York Life chose to stay silent and in so doing failed the plaintiffs in all respects.

93. Plaintiffs reasonably relied upon the expertise of NY Life, as experts in structured settlements to protect their interests and those of their son.

94. NY Life made a clear and unambiguous promise to make periodic payments to Terrence Taylor, and only Terrence Taylor, as contemplated by the Settlement Agreement.

95. Plaintiffs reasonably relied upon NY Life's promises and Plaintiff's reliance was reasonable under the circumstances.

96. As a direct and proximate cause of NY Life's failure to live up to its promise to Plaintiffs, to date Plaintiffs have suffered injury and incurred damages in an amount to be determined at trial but believed to be in excess of $1,000,000.00.

**FOURTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH CONTRACT**
*Against NY Life*

97. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

98. At all times relevant hereto, Terrence Taylor was the payee under the Settlement Agreement.

99. Louise Taylor and Phillip Taylor were parties to the Settlement Agreement.

100. The anti-assignment ("spend-thrift") provisions of the Settlement Agreement were included in that contract to protect Louise Taylor, Phillip Taylor, and Terrence Taylor.

101. NY Life's agreement to safeguard the periodic payments was a condition precedent to the Settlement Agreement.

102. By accepting a large, upfront, single-premium payment, with knowledge of the Settlement Agreement, Dismissal Order, and Terrence Taylor's permanent injuries, NY Life committed to making **_all_** of the periodic payments contemplated by the Settlement Agreement to Terrence Taylor.

103. The anti-assignment provisions of the Settlement Agreement are binding, valid, and enforceable restrictions under Virginia law.

104. The Qualified Assignment constituted a novation of the Settlement Agreement.

105.   As issuer of the Annuity Policy, NY Life was obligated to make the payments thereunder to Terrence Taylor.

106.   While not a party to the Settlement Agreement and the Qualified Assignment, NY Life had knowledge of the Settlement Agreement and the Qualified Assignment and knowingly and intentionally interfered with those Agreements, accepting "administrative fees" in connection with the Petitions and requiring Terrence Taylor to enter into "Stipulations" purporting to waive the anti-assignment provisions that he had no *power* to waive.

107.   As a result of NY Life's tortious interference with the Settlement Agreement and Qualified Assignment, Plaintiffs have suffered damages in an amount to be proven at trial, plus punitive damages and the reasonable costs and expenses of this action, including attorneys' fees.

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
*Against NY Life*

108.   Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

109.   NY Life was an integral factor in the decision of Louise Taylor and Phillip Taylor to settle their claims in the DeLonghi Litigation in accordance with the specific terms contained in the Settlement Agreement.

110.   By virtue of NY Life's unique background, experience, and knowledge of how structured settlements are designed to protect injury victims, and by virtue of how important NY Life's role was in effectuating the Settlement Agreement, NY Life owed a duty to Plaintiffs.

111.   Under Virginia law, "A fiduciary relationship exists in all cases when special confidence has been reposed in one who in equity and good conscience is bound to act in good faith

and with due regard for the interests of one reposing the confidence." *Horne v. Holley*, 167 Va. 234, 188 S.E. 169 (1936).

112. NY Life was chosen to be the issuer of the Annuity Policy because of its reputation and expertise in the structured settlement industry. As a mutual insurance company, NY Life is owned by its policyholders,[10] and has no outside shareholders. On its website, NY Life proclaims that "we are fully aligned with our policy owners, not outside investors or Wall Street." [11]

113. NY Life's website proclaims that "New York Life's management team has one overriding objective: to manage for the long term by ensuring that the right decisions are made today, so that New York Life can continue to meet its obligations tomorrow and far into the future." [12]

114. NY Life's website also states that: "Plaintiffs benefit by securing a guaranteed income tax-free stream of payments. Free of the pressures of money management and the dissipation of funds, the plaintiff can enjoy the peace of mind of financial security." [13]

---

[10] Due to the unique nature of a structured settlement annuity policy, neither Plaintiffs, nor their son, Terrence Taylor are considered "policyholders" of NY Life. The policyholder under the Annuity Policy is NY Life's subsidiary, NY Annuity.

[11] *See*, https://www.newyorklife.com/who-we-are/our-story. (retrieved on May 20, 2019).

[12] *See*, https://www.nylss.com/ss/v/index.jsp?contentId=152698&vgnextoid=63e1342fcc317310Vgn VCM100000ac841cacRCRD&vgnextchannel=901d0a08b7e07310VgnVCM100000ac841cac RCRD (retrieved on May 20, 2019).

[13] *See*, https://www.nylss.com/ss/v/index.jsp?contentId=152699&vgnextoid=e0e2342fcc317310Vgn VCM100000ac841cacRCRD&vgnextchannel=a62d0a08b7e07310VgnVCM100000ac841cac RCRD (retrieved on May 20, 2019).

115. The statements appearing on NY Life's website today are similar to the promises made to Louise and Phillip Taylor by NY Life when they settled their claims in the DeLonghi Litigation in 1989 on behalf of themselves and their minor child.

116. Plaintiffs relied upon the expertise of NY Life, as experts in structured settlements to protect their interests and those of their son.

117. Plaintiffs believed, at all times relevant hereto, that NY Life was an expert in the structured settlement industry and a secure and reliable steward for the purposes contemplated by the Settlement Agreement.

118. At all times relevant hereto, Plaintiffs believed that NY Life was in a special position of trust and confidence by virtue of their expertise and experience in the structured settlement industry, their financial strength and reputation, and their involvement with the court's approval of the Settlement Agreement in 1989.

119. Plaintiffs could not have consummated the Settlement Agreement without the involvement of NY Life.

120. Plaintiffs' reasonably relied upon NY Life's reputation and experience in agreeing to the Settlement Agreement back in 1989.

121. NY Life breached its duty to Plaintiffs by failing to act in their best interests by improperly consenting to Petitions they were duty bound to oppose.

122. NY Life further breached its duty to Plaintiffs by putting its own pecuniary interests in front of Plaintiffs.

123. NY Life had the right and the power under the Virginia SSPA to speak up and stop the transfers.  They also had a specific duty as described herein to make the periodic payments

contemplated by the Settlement Agreement. New York Life chose to stay silent and in so doing failed the Plaintiffs in all respects.

124. Instead of simply opposing the transfers, NY Life chose to collect "administrative fees" and extort "Stipulations" from Terrence Taylor that they knew violated the spendthrift provisions and power language contained in the Settlement Agreement New York Life was duty bound to uphold.

125. New York Life also knew that their serial and systematic consent for hire violated the Dismissal Order in the DeLonghi case which incorporated the Settlement Agreement by reference. By extension, NY Life's improper consent also violated the Virginia SSPA, Section 5891 of the Internal Revenue Code and their improper consent directly undermined congressional intent related to the preferential tax treatment afforded to assignment companies under 26 U.S.C. § 130. As noted earlier, Congress prescribed detailed rules governing the assignment process in 26 U.S.C. § 130(c)(d) meant to ensure that the periodic payment obligations assumed by the assignment company (here, NY Annuity) are ***identical*** to the obligations of the settling defendants (the DeLonghi defendants) and are ***identical*** to the payments to be made pursuant to the annuity policy (issued here by NY Life).

126. As a result of NY Life's breach of its fiduciary duties to Plaintiffs, Plaintiffs have suffered and continue to suffer substantial damages in an amount to be proven at trial, including punitive damages for breach of fiduciary duty, plus all costs and attorneys' fees associated with this action

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment in their favor as follows:

A. Against Defendants NY Life and NY Annuity in the amount of $1,129,036.86 for breach of contract; and

B.    For damages against NY Life related to Plaintiffs reasonable and foreseeable reliance on NY Life's promises in an amount to be proven at trial but believed to be in excess of $1,000,000.00; and

C.    For compensatory and punitive damages against Defendant NY Life for its tortious interference with contract in an amount to be determined at trial, but believed to be in excess of $1,000,000.00; and

D.    For compensatory and punitive damages against Defendant NY Life for breach of fiduciary duty in an amount to be determined at trial, but believed to be in excess of $1,000,000.00; and

E.    Costs, attorneys' fees, and reimbursement of all expenses incurred by Plaintiffs in connection with this matter, and such other and further relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiffs hereby demand trial by jury.


DATED this 23rd day of July, 2019

                              */s/ Edward S. Stone*
                              _____
                              EDWARD STONE LAW P.C.
                              Edward S. Stone, Esq.
                              *Attorneys for Plaintiff*
                              300 Park Avenue, 12th Floor
                              New York, New York 10022
                              Tel: (646) 933-3143
                              Fax: (203) 348-8477
                              Email: eddie@edwardstonelaw.com